UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TODD A. WHITE,

                  Plaintiff,                   Case No. 05-71201

vs.

                                   HONORABLE JOHN FEIKENS
                                   HONORABLE STEVEN D. PEPE

BAXTER HEALTHCARE CORPORATION,

                   Defendant.

_____/

**REPORT AND RECOMMENDATION**

On March 28, 2005, Plaintiff, an African-American male (Complaint, ¶ 10), filed his complaint alleging race discrimination pursuant to 42 U.S.C. §1981 (§1981), 42 U.S.C. 2000e, et seq. (Title VII) and Michigan's Elliot-Larsen Civil Rights Act, M.C.L. 37.2101 (Elliot-Larsen) and gender discrimination pursuant to Title VII and Elliot-Larsen against his employer, Defendant Baxter HealthCare Corporation.

Defendant filed its motion for summary judgment on March 31, 2006 (Dkt. # 7), which was referred to the undersigned on June 5, 2006.

For the reasons stated below, IT IS RECOMMENDED that Defendant's motion be GRANTED.

I.     **STANDARD OF REVIEW**

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Rule 56(c) mandates summary judgment against a party who, after adequate time for discovery,[1] fails to establish

---

[1] While there is not a scheduling order mandating discovery cut-off in this matter, Plaintiff filed the complaint more than one year before Defendant's motion for summary disposition. further, none of Plaintiff's arguments in opposition to Defendant's motion pertain to a need for further discovery.

the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party has the initial burden of showing "the absence of a genuine issue of material fact." *Id.*, at 323, 106 S.Ct. at 2553.  Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.*, at 249-50, 106 S.Ct. at 2511.

Rule 56(e) provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, *by affidavits or as otherwise provided in this rule*, must set forth specific facts showing that there is a genuine issue for trial.  If he does not so respond, summary judgment, *if appropriate*, shall be entered against him."  Fed. R. Civ. P. 56(e) (emphasis supplied).

## II.   FACTS [2]

Defendant Baxter Healthcare Corporation, is a wholly-owned, U.S.-based subsidiary of Baxter International, Inc. Baxter International produces and sells medical technologies related to the blood and circulatory system.

Among Defendant's business groups is ACCO, which stands for Anesthesia, Critical Care, and Oncology (Exhibit A, White Dep., pp. 154-55)[3].  Defendant purchased Plaintiff's employer, Ohmeda, in April 1998, and merged it into ACCO (Exhibit A, White Dep., pp. 14-15).

Plaintiff's duties both at Ohmeda and at Baxter consisted of selling proprietary and generic products to anesthesia professionals (Exhibit A, White Dep., p. 14).  As a sales representative, Plaintiff is supervised by a Regional Manager.  Regional Managers, in turn, report to an Area Vice President (Exhibit A, White Dep., pp. 154-55).

When Plaintiff became employed by Baxter, he was supervised by Richard Clark, the same Regional Manager to whom he reported at Ohmeda (Exhibit A, White Dep., pp. 14-15).  In 1999 and 2000, Plaintiff was supervised by Regional Manager Richard Burns (Exhibit A, White Dep., p. 16).

---

[2] In his complaint Plaintiff alleged both gender and race discrimination pursuant to §1981, Title VII and Elliot-Larsen and specifically pled allegations to support a racially hostile work environment claim and what appeared to be multiple instances of disparate treatment based on race.  In his response to Defendant's motion for summary judgment Plaintiff offered no argument and provided no Fed. R. Civ. P. 56 (Rule 56) compliant evidence to support several of the claims originally pled in his complaint.  In fact, Plaintiff seemed to narrow the focus of his claims to race discrimination under Title VII and Elliot-Larsen based upon Defendant's failure to promote him to Regional Manager and race discrimination under Title VII and Elliot-Larsen based upon disparate treatment received in Phillip's review of Plaintiff's 2004 performance.
    The facts recited in this section are only those allowed to be considered by Fed. R. Civ. P. 56(e), i.e. those contained in depositions, answers to interrogatories and admissions on file; supporting affidavits and undisputed facts contained in the pleadings.  *Smith v. Hudson*, *supra*, 600 F.2d at 64-65.

[3] Unless otherwise noted, the exhibits referred to are those attached to Defendant's motion for summary judgment.

3

In 2001, Plaintiff moved into a position titled Teaching Center Specialist in which he sold products to anesthesia professionals at larger hospitals that ran teaching programs. A Teaching Center Specialist (TCS) is dedicated to residency programs for doctors and nurses in anesthesia programs. They are responsible for sales as any other sales representative, but are held to a higher standard of product knowledge and teaching skills (Exhibit A, White Dep., pp. 16-18; Exhibit C, Kunz Dep., pp. 32-33).

As a TCS, Plaintiff was supervised again by Richard Clark, and continued to report to Clark until January 1, 2004. Plaintiff testified that he has no reason to think that Clark has any discriminatory animus against blacks or men (Exhibit A, White Dep., pp. 16-20).

From January 1, 2004, to the present, Plaintiff has reported to Regional Manager of Northern Teaching Center Specialists, Tim Phillips. Phillips supervises six to seven Teaching Center Specialists. Plaintiff testified that he has no reason to think that Phillips has any discriminatory animus against men (Exhibit A, White Dep., pp. 18, 20; Exhibit B, Phillips Dep., pp. 6-7).

Throughout his employment with Baxter, Plaintiff has been recognized for his strong sales performance. In addition to being elevated to the Teaching Center Specialist position, Plaintiff received an award for the Distinguished Sales Club for 2000 for being in the top five percent of sales representatives, a Sales Achievement Award for 2003, and was rated as exceeding expectations for 2000 and 2003, and as meeting expectations for 2001 and 2002 (Exhibit D, Clark Dep., pp. 24, 71-72, 99-105, 113 and Clark Dep. Exs. 1, 8, 18, 19, 20, 21).

In September 2004, Plaintiff applied for a Regional Manager position. This was the first Regional Manager position for which Plaintiff had applied (Exhibit A, White Dep., pp. 154-58). There were no and had never been any African Americans in the role of Region Manager or in a

4

higher position within the division (Defendant's Answer, ¶27). Plaintiff alleges that Defendant's failure to promote him to this position constitutes race discrimination in violation of Title VII and Elliot-Larsen (Dkt. #10, p. 35).

Carl Gold, ACCO Area Vice President for Sales for the eastern half of the United States since the fall of 2003, was the ultimate decision-maker in determining who would be selected for the position. Gold asked Human Resources Director Daryl Martin and ACCO Area Vice President for the western half of the United States Carl Kunz to interview all candidates for the position with him, and to be a part of the hiring process (Exhibit E, Martin Dep., pp. 99-100; Exhibit F, Gold Dep., pp. 27). Tim Phillips, Plaintiff's supervisor, was not formerly involved in the Regional Manager selection process (Exhibit B, Phillips Dep., p. 98-100; Exhibit A, Plaintiff Dep., p. 182.), although Phillips testified that he told Gold before the interview that Plaintiff would be a good fit for the position (Exhibit B, Phillips Dep., p. 98-100) and Carl Gold testified that Phillips had discussed Plaintiff with him and Plaintiff "never came out in OTR process[4] . . . as being a high performer . . . as being somebody that was ready to move into a regional manager role (Plaintiff's Response, Exhibit 21, Phillips Dep., p. 63-64). Gold also stated that from "managers' comments" he gleaned that Plaintiff was "not referred to as a team player. He talked a lot about I, me . . . my way or the highway" (*Id.*).

Plaintiff testified that he has no basis on which to believe that Gold, Martin, or Kunz has any discriminatory animus toward blacks or men (Exhibit A, Plaintiff Dep., pp. 20-21).

Gold, Martin, and Kunz considered five candidates: Plaintiff, Maggie Freed, Brett Corrick, Stacy Hord, and Carey Redd. All but Plaintiff are Caucasian and all but Freed are men (Exhibit C,

---

[4] "OTR" stands for Organized Talent Review and is described more fully in footnote 7 below.

Kunz Dep., p.79 and Kunz Dep. Ex. 2).

All five candidates submitted resumes and participated in interviews of about one hour each with each of the three interviewers (Exhibit A, Plaintiff Dep., pp. 162-63; Exhibit C, Kunz Dep., p. 178; Exhibit F, Gold Dep., p. 89).

After the interviews, Gold, Martin, and Kunz each arrived at their own rankings of the candidates. All rated Maggie Freed as the top candidate. Gold rated Stacy Hord as the second best, and Brett Corrick as the third best, while Martin and Kunz each rated Corrick as number two and Hord as number three. All three rated Carey Redd as the fourth best candidate. Gold, Martin, and Kunz all rated Plaintiff last among the five candidates (Exhibit C, Kunz Dep., pp. 99-101 and Kunz Dep. Exs. 3, 5, 7, 9, 10 (containing resumes and Kunz's notes and grades of all five candidates); Exhibit E, Martin Dep., pp. 148-49, 154; Exhibit F, Gold Dep., pp, 81, 97-98).

Defendant provided the following as reasons Freed was ranked as the top candidate by the three interviewers:

- Freed was well-prepared for the interview with specific objectives for turning around the region, was enthusiastic and demonstrated confidence and a high energy level during her interview (Exhibit C, Kunz Dep., pp. 142, 145; Exhibit F, Gold Dep., pp. 92, 93) and basically had an excellent performance in the interview (E, Martin Dep., p 125).

- Freed had experience hiring, training and managing people (Exhibit C, Kunz Dep., pp. 139, 147). In the position she held before being selected as Regional Manager, Freed managed two direct reports, was responsible for hiring and training a group of 14-16 national field trainers for the "pharmaceutical side, the device side then

6

eventually the multi-source pharmacuetical side" (Exhibit G, Freed Dep., pp. 27).  She

also  developed and implemented the training programs[5] (*Id.* at p. 28).

•     Freed won sales trips three times during her employment with Baxter (Exhibit G,

Freed Dep., p. 63).

•     In her performance reviews Freed was rated as exceeds expectations for 2000, 2001

and 2002, and was regarded as too new to review in her new position for 2003

(Exhibit G, Freed Dep., pp. 57, 63, 64, 74-75 and Freed Dep. Exs. 3, 4, 5, 7).

•     The interviewers initial concerns regarding Freed's level of product knowledge (she

sold devices and not proprietary pharmaceuticals for Baxter) were addressed because

she had a sales background and lots of sales experience (she sold proprietary

pharmaceuticals while employed by Lederle Laboratories, devices for IMed, and

devices for Baxter for several years) she had attended all training classes on the

proprietary products, she designed training programs and taught the new sales

representatives about the products and had facilitated classes on the products (Exhibit

C, Kunz Dep., pp. 139, 143 & Ex. 9; Gold Dep., p. 137; Exhibit G, Freed Dep., pp.

8-11, 27- 29, 31, 57, 63, 64, 74-75).

Defendant provides the following reasons all three interviewers rated Plaintiff as the fifth out

of five:

•     In the opinion of Interviewer Martin, Plaintiff was talking "at her" as opposed to "to

her," did not demonstrate a sense of strength in coaching others as did Freed, and was

---

[5]Plaintiff alleges that Ms. Freed testified about a management situation in which she had felt intimidated, but did not attach the portion of her deposition in which she is alleged to have so stated (Dkt. #10, p. 25-26).

overly aggressive in the interview.

(Exhibit E, Martin Dep., pp. 130, 147).

- In the opinion of Gold, Plaintiff was "in your face aggressive" and came off as too confrontational and "in your face" to effectively ride with and coach a sales representative. He asked Gold questions that caused him to be concerned about the type of questions he would ask a sales representative. Gold further said that, "Instead of sticking to the facts about what he brought to the party or what he would do if he took the position and being specific about that, he asked me what I have done to promote cultural diversity within Baxter ACC. I'd rather hear about his plan of action, where he thought the business was going, what he'd do in the region to change things."

  Gold felt Plaintiff overused the word "I," and commented that "If he approached the interview in the way he did and replicated that with reps, it would be a disaster. Todd got right in my face. My feedback to him was that he needs an interviewing class. He needed to talk about things other than himself or 40,000 foot issues that you could spend three days talking. Did he want to talk about turning this region around, or about cultural diversity?"

(Exhibit F, Gold Dep., pp. 83-88).

- In the opinion of Kunz, the interview with Plaintiff was "difficult," "uncomfortable," and "tense." Plaintiff was forceful and assertive, but sometimes crossing over into aggressive and agitated. Kunz found it difficult to ask Plaintiff questions because Plaintiff wanted to present to him. Further, Plaintiff would use phrases that Kunz had

8

difficulty understanding. When Kunz asked Plaintiff how he would turn the region around, Plaintiff responded on how the sales reports were incorrect. When Kunz then tried to steer Plaintiff to focus on the people, and not the reports, Plaintiff presented him what Kunz regarded as faulty logic. Kunz also perceived that Plaintiff gave broad answers to questions such as "I will set consistent standards," or "I will build a coalition," and that when Kunz asked Plaintiff what he meant by those broad statements, Plaintiff would become defensive and condescending by repeatedly using Kunz's name and say things such as "I really want to be perfectly clear on this point, do you get it? do you understand it?" Kunz also believed that Plaintiff came across as having an overly directive "my-way-or-the-highway" management style as in "we're not going to have a negotiation here" or "we're not going to have a conversation." Moreover, Kunz believed that while Plaintiff had a proven sales record and good team member, he had shallow experience in managing people.

(Exhibit C, Kunz Dep., pp. 154-66 and Kunz Dep. Ex. 10).

Defendant argues that, based on the consensus of all three interviewers, Gold decided to select Freed as the Regional Manager for the Chicago region (Exhibit C, Kunz Dep., p. 70; Exhibit E, Martin Dep., p. 159-60; Exhibit F, Gold Dep., pp. 98, 113-14 and Gold Dep. Ex. 4).

In his Response Plaintiff argues that he was more qualified for the Regional Manager position than any of the other applicants because:

- he has a Master Degree in Business Management and all the other applicants have only Bachelor's Degrees (Dkt. #10, Exhibit 23, Candidate Resumes).

- he had been successfully selling Defendant's proprietary products, the products that

would be sold by the salespersons the Regional Manger would oversee, since he had begun his employment with Defendant in 1997 (Dkt. #10, Exhibit 2, White Dep., p. 14 and Exhibit 24), while Freed's sales experience was with devices and not pharmaceuticals (Dkt. #10, p. 25 and Exhibit 13, Kuntz Dep., pp.140-143).[6]

- he had worked for 3 years as a TCS which required educating physicians, anesthesia students and nurses at several hospitals regarding the proprietary products (Dkt. #10, Exhibit 13, Kunz Dep., p. 32), i.e. he was held to a "higher standard in terms of product knowledge" and was a "super sales person" (*Id*. at 35).

- Phillips thought Plaintiff would be a good fit for the position and had informed Gold of such prior to the interviews (Dkt. #10, Exhibit 4, Phillips Dep., pp. 99-100).

---

[6] In his Response Plaintiff indicates that Interviewer Kunz "admits" concerns about Freed's lack of experience selling Baxter's proprietary pharmaceuticals, quoting a portion of Kunz's deposition.  Yet Plaintiff neglected to quote the portion of the deposition immediately following this quote in which Kunz explains that

> Maggie did a wonderful job of handling that issue.  We talked about the progress she had made relative to pharmaceutical product knowledge over the previous two years. We talked about the various types of training programs that she helped design, which a big part of that was pharmaceutical, and about the fact that she had attended all of the training classes more than once and she had made a lot of progress in terms of product knowledge.  She also worked in the field with reps and had experienced sales calls, all the things a typical rep would experience.  Was it still a bit of a concern? Absolutely, because she was the one of all the candidates who had never sold or carried a bag of pharmaceutical products, so to speak, early in her career, so it was a topic that we talked a lot about.

(Dkt. #10, Exhibit 13, Kunz Dep., p. 142-143).

<u>Review of Candidate Documents Prior to Interviews</u>[7]

Interviewer Kunz was asked a series of questions in his deposition regarding the interview

process for the Regional Manager position and responded as follows:

> Q – How about . . . qualifications . . .
> A – I usually review their resume with them and then given [sic] them the opportunity to add to that resume. . . . .
> Q – If the candidate is already employed with Baxter, do you ever look at their performance reviews?
> A – Of course.
> Q – Is that pretty standard?
> A – Yes.
> Q – Do you recall if you looked at the performance reviews for the five candidates for the region manager position . . . .
> A – As a matter of fact, I don't know that I looked at each of them specifically. I know I had access to Bret Corrick's.
> . . . .
> A – You know, to be honest with you, I did not specifically review their performance review before that interview.  That's not a fair statement.
> Q – It's not a fair statement to say that you did review them?
> A – Yes.  So, I am correcting myself.
> Q – Previously had you typically reviewed performance reviews before conducting interviews?
> A – I could.  I wouldn't say it's a standard protocol with me but --
> Q – Any reason you didn't in this case?
> A – Well, because I was part of the final interview team.  If this had been me doing the interviewing, you know, at an early stage, I would have been more focused on such things.

(Dkt. #10, Exhibit 13, Kunz Dep., p. 82-84).

Interviewer Gold testified that he referred to the Organizational Talent Review (OTR) process

---

[7]Defendant Baxter conducts Organized Talent Reviews (OTR) of employees for development proposes in which groups of managers highlight the strengths and interests of their employees (Exhibit B, Phillips Dep., p. 90; Exhibit D., Kunz Dep., pp.60-61).  Employee Performance Reviews are also completed wherein employees and their supervisors comment on the employees' mid-year and year-end performance in the context of a selected number of "performance management objectives" (PMO) and "success factors" (Dkt. #10, Exhibit 30, White 2004 Performance Evaluation).  For sales persons the first PMO is sales and this PMO is weighted 70% (Dkt. #10, Exhibit 31).

at some point, but did not review the performance reviews because it would already have been done

at this stage of the interview process:

> Q – When you go to review the OTR process when you determine that a position is open and I think you indicated with respect to this central Midwest region manager position that you did look at the OTR process, that's something that you already had in your possession?
>
> A – I looked at what the managers – who the managers presented in their OTR process, you know, who they said that they felt based on their filed visits, working with them, based on track record, based on things like, you know, how they perceive them working with reps and did they have the skill sets, we looked at all.  That's what we looked at and they bring their recommendations to me.
>
> Q –  And is it fair to say at the time of the interviews for this central Midwest region manager position that you did not consider Todd White to be a high potential based on your review of the OTR process?
>
> A –  Yes.
>
> Q –  Is there anything specifically that you looked at that demonstrated to you or reflected that he was viewed upon by his managers as not being a high potential?
>
> A –  Yes.
>
> Q –  And what was that?
>
> A –  Well, Todd was not – in this case was not referred to as a team player. . . . .

(Dkt. #10, Exhibit 21, Gold Dep. pp. 62-63)

> Q – Coming into the interviews did you have a ranking in mind based upon their resumes?
>
> A –  No.
>
> Q –  Did you look at prior performance reviews for the candidates prior to the interviews?
>
> A –  I knew that all the candidates, they all had a good track record and outside of that, no.
>
> Q –  Typically when you would interview someone for a region manger position, would you look at their performance reviews?
>
> A –  That was already done in most cases with these five candidates that came in.  I mean, we knew that they – these folks based on the OTR process.  I mean, we knew that they had made numbers in the past and that they wouldn't have been interviewed.

(*Id.* at pp. 102-103).

Interviewer Martin testified that she did not review any of the candidates resumes or

performance evaluations before the interviews (Dkt. #10, Martin Dep., pp. 104, 149).

<u>Trade Relations Manager</u>

In his complaint Plaintiff alleged that he was denied access to another position, Trade Relations Manager, which opened in December 2003, because it had not been posted.    In Defendant's motion the following undisputed facts are presented:

- The position was posted on Baxter's intranet (Exhibit E, Martin Dep., pp. 85-98 and Exhibit 17).

- At least three candidates were interviewed for this position (*Id.* at 97).

- Plaintiff did not apply for this position (Exhibit A, Plaintiff Dep., pp. 224-26, 251-57).

<u>Sales Trainer</u>

On December 7, 2004, Scott Vickers notified Plaintiff via email of an opening for a Sales Trainer position (Dkt. #10, Exhibit 28).  When Plaintiff told Tim Phillips that he was interested in this position, Phillips discouraged him from applying for it at that time (Exhibit A, Plaintiff Dep., pp. 242-44).  Phillips emailed Plaintiff saying "with everything you have going on in your life and your Suprane where it is, I am not sure this is the wisest move at this particular time.  The time commitment is huge . . . probably on average 3-5 days a month away from home (maybe more . . .). There will be other opportunities in 2006 if you are still interested in pursuing this. . . . ." (*Id.*).

Phillips did not communicate with Scott Vickers about Plaintiff or his candidacy (Exhibit B, Phillips Dep., pp. 106-108).[8]  Plaintiff did not apply for the Sales Trainer position (Exhibit A, White Dep., p. 281).

<u>Interviewing Skills Class</u>

---

[8] Plaintiff alleges that after Phillips discouraged him from applying for the Sales Trainer position, Vickers then discouraged him from applying and purports to attest to this in his own attached affidavit (Dkt. # 10, p. 27).  Yet, Plaintiff's affidavit does not mention Vickers or the Sales Trainer position (Dkt. #10, Exhibit 1).

After Plaintiff was not selected for the Regional Manager position, Carl Gold told Plaintiff that he should take an interviewing skills class (Exhibit F, Gold Dep., pp. 106-07). Plaintiff asked Phillips for assistance in obtaining an interviewing skills class. Plaintiff alleges that Phillips blocked him from accessing an interviewing skills class. In its motion for summary judgment Defendant provided evidence to support the following undisputed facts:

- On October 25, 2004, Phillips sent an email to the Baxter Institute for Learning and Development inquiring about an interview class.

- He received a response on the following day, which he forwarded to Plaintiff, saying that insufficient funds existed in the budget for such a class in 2004 and it was "questionable for 2005" and providing a contact for counselors who specialize in career development and interviewing skills (Exhibit A, Plaintiff Dep., pp. 221-22 and Dep. Ex. 26).

2004 Performance Review

Before 2004, ACCO rated sales representatives as either "exceed expectations," "meets expectations," or "does not meet expectations." If a sales representative did not meet his or her sales goals, that representative could not be rated anything higher than a "does not meet." Further, a representative rated as "does not meet" generally could not receive a pay raise (Exhibit A, Plaintiff Dep., p. 261; Exhibit B, Phillips Dep., pp. 57-58; Exhibit D, Clark Dep., p. 98).

In 2004, ACCO created for the first time a category of "meets minus" so that a sales representative who does not meet his or her sales goals could avoid a "does not meet" rating, and thus still receive a raise (Exhibit D, Clark Dep., p. 98).

In 2004, Plaintiff did not meet his sales numbers in all categories (Exhibit A, Plaintiff Dep., p. 260). For the four proprietary products that Plaintiff sold in 2004 his year-end sales numbers were

14

as follows: Suprane, 92%; Brevibloc,105%; TDS,101% and PSA, unknown (Dkt. #10, Exhibit 30, p. BAX000531). In his 2004 performance review he was rated "does not meet" for the sales PMO based on these numbers (*Id.*). In total he received 2 "exceeds", 3 "meets", and 2 "does not meet" ratings for 2004 (*Id.* at pp. BAX000531-533).

On the final page of the 2004 performance review Phillips indicated that Plaintiff's overall score should have been a "does not meet" but that "due to [Plaintiff's] diligence and commitment to the business that has been demonstrated by his focus on Suprane and his consistent work in the Region, I have moved this rating to a Meets (-). . . . . In addition, at Mid-Year 2005, I will expect that Todd is achieving budget in 2 of 4 categories, one of them being Suprane. Otherwise further corrective action may be needed. Todd has overachieved in the past so I know he [sic] capable with a dedication of more focus on his Baxter ACC franchise" (*Id.* at BAX000538). Plaintiff received a raise in 2005 based on the 2004 review (Exhibit A, Plaintiff Dep., pp. 260-63).

Phillips testified that he awarded Plaintiff the highest rating he could award based on the sales numbers (Exhibit B, Phillips Dep., pp. 56-65 and Dep. Ex. 2). Gold had sent out an email to the Regional Managers in October of 2004, which Phillips forwarded to Plaintiff, indicating that any sales representative with Suprane sales less than 95% was to receive a "does not meet" rating, no salary increase and be placed on a performance improvement plan or "PIP" (Dkt. #10, Exhibit 26).

Plaintiff argues that Defendant's "2004 Grid PMO Evaluation For TCS' (attached as Appendix 1) dictates that he should have received a "meets" rating, because he was at 100% in 2 of 4 categories, one being Brevibloc. Plaintiff points to two white TCS who were supervised by Phillips, Stephen Morris and Theresa Thomas, and who also did not meet all of their sales goals but

15

were not given a "does not meet" rating Plaintiff received (Dkt. #10, Exhibits 40, 41).[9] The following

table depicts a comparison of these three TCS' ratings for their 2004 Employee Performance Reviews

:

| PMO | Plaintiff | Thomas | Morris |
|---|---|---|---|
| 1 - Sales Budget | Suprane    92%;<br>Brevibloc 105%<br>TDS         101% | Suprane    107%;<br>Brevibloc  87%<br>TDS         119% | Suprane    103%;<br>Brevibloc  93%<br>TDS         157% |
| | Does Not Meet | Meets | Meets[10] |
| 2 - SRNA/Residents Tracking Tool | Exceeds | Meets | Exceeds |
| 3 - Speaker/Advocate Development | Meets | Meets | Exceeds |
| 4 - Achieve Key Company Objectives | Meets | Exceeds | Meets |
| 5 - Prudent Expense/ Resource Management | Exceeds | Exceeds | Meets |
| 6 - Ensure Strong Communication | Meets | Exceeds | Meets |
| 7 - Suprane Incentive Contest | Does Not Meet | Meets | Meets |
| **Overall** | **Meets-** | **Meets** | **Meets** |

<u>2002 Stock Option Awards</u>

While Baxter's ACCO business usually does not award stock options to sales representatives,

it decided to award a stock options to certain sales representatives in 2002 (Exhibit H, Taylor Decl.

_____

[9]Plaintiff also provided data on a number of persons that are not supervised by Phillips.

[10]In the performance review Phillips indicated that he moved Morris' sales PMO up to a "meets" because "of Steve's superior performance with Suprane".

16

¶¶ 3-4).  Of the approximately 170 ACCO sales representatives employed in 2002, twelve of them received stock options (*Id.* at ¶ 7).  Those twelve were selected because they were considered at the time to be high performers with high potential, and they were believed to be a retention risk (that is, a Baxter employee who might leave).  Plaintiff was not awarded stock because he was not considered to fit this criteria (*Id.* at ¶ 6, 8).

<u>Hostile Work Environment</u>

<u>*Tim Phillips*</u>

When Plaintiff explained to Phillips that he thought the timing of a January 2004 sales meeting, that commenced with a dinner on Martin Luther King Day, was insensitive, Phillips allegedly said to him, "Nobody wants to be around a black man" (Exhibit A, Plaintiff Dep., pp. 42-45, 109-10).[11]

Phillips allegedly referred to Plaintiff, Todd White, as "White, Todd" when he answered a telephone call from Plaintiff in late 2004[12] (Exhibit A, Plaintiff Dep., p. 48).

In early 2005, the name of Tanisha Gabriel, an African-American sales representative who works in another territory came up in conversation and Phillips allegedly remarked, "Oh, that black girl" (Exhibit A, Plaintiff Dep., pp. 39-41).

In January 2005, Phillips circulated an e-mail to all those that reported directly to him, in which an image morphed back and forth between Osama bin Laden and O.J. Simpson, with a caption "I knew it! I knew it!" (Exhibit A, Plaintiff Dep., pp. 114-22, Exhibit 17; Exhibit B, Phillips Dep.,

---

[11] Phillips made a similar comment to a former sales trainee, Jacinta Toland in October 1999 (Dkt. #10, Toland Affidavit, Exhibit 20, ¶7).

[12] Plaintiff does not give an exact date for this conversation, but it is alleged to have taken place after Scott Vickers sent the email to Plaintiff regarding the Sales Trainer position (*Id.*), which was sent December 7, 2004 (Dkt. #10, Exhibit 28).

pp. 117-19).

*Co-Workers*

Plaintiff alleges that Scott Bondy, an ACCO sales representative who sells devices in a territory that overlaps with Plaintiff 's teaching center territory (Exhibit A, Plaintiff Dep., pp. 60-61), made the following comments to him:

a. When Plaintiff won the Distinguished Service Club ("DSC") award, Bondy told Plaintiff that no black man had ever won a DSC before (Exhibit A, Plaintiff Dep., p. 98).

b. When Plaintiff lived either in Southfield or Farmington Hills, Bondy once remarked that he would not go to Plaintiff 's house because he was afraid he'd be robbed or that someone would break into his car (Exhibit A, Plaintiff Dep., pp. 100-01).

c. In 1999, Plaintiff picked up Bondy at Bondy's house, and Bondy's dog barked. Bondy remarked that, "My dog has never seen a black person besides the UPS man, so that's why he's barking like this." (Exhibit A, Plaintiff Dep., pp 103-05).

d. Bondy and sales representative Scott Huber referred to Plaintiff as "Lee Elder," a famous black golfer, during golf outings (Exhibit I, Bondy Dep., pp. 21-22).

e. Bondy referred to Plaintiff as "Whitey."[13]

f. On an occasion on which Plaintiff cannot place a date, Bondy commented that the nurses at a hospital were like slaves, and then said to Plaintiff , "no offense, Todd." (Exhibit A, Plaintiff Dep., pp. 92-93).

g. On an occasion on which Plaintiff cannot place a date, Bondy told Plaintiff that he "saw

---

[13] When Plaintiff told Bondy that "Whitey"might be regarded as racially offensive, Bondy thanked him for bringing that to his attention and ceased referring to Plaintiff by that nickname (Exhibit I, Bondy Dep., p. 24).

a black squirrel and it reminded me of you," to which Plaintiff responded, "that's mighty white of you." (Exhibit A, Plaintiff  Dep., pp. 87-91).

h. On October 26, 2000, Bondy sent an e-mail to a number of his peers, including Plaintiff, that Plaintiff found racially offensive because it contained a joke about a hands-free cellular phone adapter with a picture showing a man wearing a rubber band attaching a cellular phone to his head. The man in the picture was black (Exhibit A, Plaintiff  Dep., pp. 96-7 and Plaintiff  Dep. Ex. 13).

i. At a regional meeting hosted by Plaintiff's manager, Dick Clark, on January 30 through February 1, 2001, Bondy allegedly made a number of comments Plaintiff found racially offensive:

(i.) Bondy told a joke to Plaintiff: "What's long and hard on a black guy?  The third grade" (Exhibit A, Plaintiff  Dep., pp. 78-79).  Plaintiff recalled that only the two of them were present.

(ii.) Bondy remarked that "black people don't ski" (Exhibit A, Plaintiff Dep., pp. 81-85).  Plaintiff recalled that other people were present, but did not recall who.  He did not recall whether Clark was present, but did recall that he did not report the incident.

(iii) In front of other sales representatives and manager Dick Clark, Bondy commented to Plaintiff , "you're pretty handsome for a black guy" (Exhibit A, Plaintiff Dep., pp. 61-72).

j. In early 2002, Plaintiff  told Bondy that Plaintiff 's wife was pregnant. Bondy replied, "are you the father" which Plaintiff  interpreted as a racial comment (Exhibit A, Plaintiff Dep., pp. 65-66).

Baxter's Knowledge/Action

As mentioned above, manger Dick Clark heard Bondy remark about Plaintiff, "you're pretty handsome for a black guy."  According to Plaintiff, Clark approached Plaintiff and asked whether

19

Bondy was bothering him, to which Plaintiff replied that he was (Exhibit A, White Dep., p. 67). Plaintiff said that Clark indicated that he did not agree with Bondy's behavior and could have him terminated. Clark testified that he was angered at hearing the comment and remembered saying "as far as I was concerned I would – you know, I believe something like the words came out, 'Fire Mr. Bondy' "(Exhibit D, Clark Dep., p. 46). Plaintiff told Clark that he wanted to speak with Bondy himself (*Id.*; and Exhibit A, White Dep., p. 67). Clark testified that he told Plaintiff, "Todd, I don't feel comfortable about that. I want to take this thing through the whole process" (Exhibit D, Clark Dep., p. 48).

Plaintiff met Bondy at a Cracker Barrel restaurant and talked with him about the situation (Exhibit A, White Dep., p. 67, 72).

Clark reported this event to his manager Wally Candelario, who was angry about the comment (Exhibit D, Clark Dep., p. 47). Clark requested that Candelario not take any action because Plaintiff had told Clark that Plaintiff would take care of the matter (*Id.* at 48). Regardless, Clark did speak with Scott Bondy and told him that such comments were not permitted (*Id.* at 52). Plaintiff sent Clark a thank you card acknowledging Clark's actions concerning this event (Exhibit A, White Dep., pp. 68; Exhibit D). Plaintiff never complained to Clark about Bondy again (Exhibit D, Clark Dep., pp. 135-36).

Plaintiff testified that he understood that if he experienced or witnessed discrimination or harassment at Baxter, he had the right to report it either to his supervisor, manager, a human resources representative, or any other member of management (Exhibit A, Plaintiff Dep., pp. 22-24, and Plaintiff Dep. Exhibit 2). Plaintiff took anti-harassment training classes, which provided information on the avenues by which to report harassment (Exhibit A, Plaintiff Dep., pp. 24-26, and

20

Plaintiff Dep. Exhibit 3).

It is undisputed that Plaintiff never reported the comments, jokes, or e-mails that he considered racist to Baxter management or human resources (Exhibit A Plaintiff Dep., pp. 65-66, 78-79, 81-85, 87-91, 92-93, 96-97, 100-01, 103-05, 109-10, and 122-31).

### III.    ANALYSIS

#### A.    Hostile Work Environment

Defendant argues that Plaintiff's hostile work environment claims are time-barred and without merit, to which Plaintiff provides no legal argument except to say that "[t]he myriad demeaning comments of [Plaintiff's] co-workers and supervisor demonstrate the racially discriminatory climate" (Dkt. #10, p. 4).

For federal courts to exercise jurisdiction over Title VII claims, the claimant must first present the claim to the Equal Employment Opportunity Commission (EEOC) or equivalent state entity. *Bellamy v. Fritz*, 129 Fed. Appx. 245, 247, 2005 WL 953847, *1 (6th Cir. 2005). "Michigan's Department of Civil Rights is a state entity with authority to grant or seek relief with respect to such claims, and therefore any claim filed with the Department of Civil Rights must be filed within three hundred days of the last act that contributed to the creation of a hostile work environment." *Id.*, citing 42 U.S.C. § 2000e-5(e)(1).  A Title VII action must be filed within three hundred days of any act that is part of the hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-19 (2002).  Plaintiff filed his EEOC claim on February 3, 2005.  The acts alleged to have taken place within 300 days of the EEOC filing date are: Phillips' referring to a co-worker as "oh that black girl"; referring to Plaintiff as "White, Todd"; circulating the email of Osama Bin Laden morphing into O.J. Simpson.  Under *Morgan*, prior acts falling outside the 300 day filing period may also be

taken into consideration, provided they are part of the same hostile work environment. *Id.* at 118-119.[14]

Elliot-Larsen claims are not subject to the continuing violations doctrine and must be filed within three years of the date a cause of action accrues – an employee is not permitted to bring a lawsuit for employment acts that accrue beyond this period. *Garg v. Macomb County*, 696 N.W. 2d 646, 659 (Mich. 2005). Plaintiff filed this lawsuit on March 28, 2005. The acts alleged to have taken place within 3 years of this filing date are: those listed in the paragraph above plus the comment by Phillips, "Nobody wants to be around a black man".

In *Jones v. R.R. Donnelley & Sons*, 541 U.S. 369 (2004), the Supreme Court adopted a four year statute of limitations for claims under 42 U.S. §1981. The acts alleged to have taken place within 4 years of this filing of the complaint are: those listed in the paragraphs above plus the comment by Plaintiff's co-worker Scott Bondy, upon hearing that Plaintiff's wife was expecting a baby, "Are you the father?"

The elements of a hostile work environment claim under Title VII, §1981 and Elliot Larsen are virtually identical. Plaintiff must show that (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on his race and (4) the harassment affected a term, condition, or privilege of his employment. *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1078-1079 (6th Cir. 1999)(Title VII and Elliot-Larsen); *Hafford v.*

---

[14] But note that if an employer intervenes at some point, this may preclude past acts from being included in a current hostile environment claim. *Id.* at 118 ("On the other hand, if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.").

*Seidner*, 183 F.3d 506, 512 (6th Cir.1999) (§1981).

Under the federal statutes, an employer is vicariously liable "for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth*, 118 S.Ct. at 2270.  When no tangible employment action is taken, an employer may raise an affirmative defense to liability by proving, by a preponderance of the evidence, that (1) it exercised reasonable care to prevent and correct promptly any racially harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of corrective opportunities provided by the employer.  *See id.*  Conversely, under state law, vicarious liability will be found only where the plaintiff has carried the burden of proving respondeat superior.  "This ordinarily requires a showing that either a recurring problem existed or a repetition of an offending incident was likely and that the employer failed to rectify the problem on adequate notice.  *Radtke v. Everett*, 501 N.W.2d 155 (1993).  Notice . . . sufficient to impute liability to the employer exists where, 'by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of the substantial probability that [ ] harassment was occurring.'"  *Chambers v. Trettco, Inc.*, 624 N.W.2d 543, 544 - 545 (Mich. App. 2001) (citations omitted).

As for the acts of co-workers, under both state and federal law, a plaintiff may hold an employer directly liable if she can show that the employer knew or should have known of the conduct, and that its response manifested indifference or unreasonableness.  *See Blankenship*, 123 F.3d at 873 (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 805 (6th Cir.1994)).  Significantly, a court must judge the appropriateness of a response by the frequency and severity of the alleged harassment.  *See Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1252-53 (6th Cir.1985).  Generally, a response is adequate if it is reasonably calculated to end the harassment.  *See*

*Intlekofer v. Turnage*, 973 F.2d 773, 778 (9th Cir.1992) (citing *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983)).  *Jackson v. Quanex Corp.*  191 F.3d 647, 663 (6th Cir. 1999).

In the present case it is undisputed that Plaintiff did not report to Defendant regarding any of the harassing actions or comments about which he now complains, though he testified that he knew that Defendant had a anti-harassment policy.  It is further undisputed that on the one occasion in which Defendant can be said to have had knowledge that Bondy made an inappropriate comment, i.e. when Plaintiff's supervisor, Clark, overhear Bondy say that Plaintiff was "pretty handsome for a black guy", Clark took action and offered to inquire about having Bondy fired, and it was Plaintiff that asked that nothing be done and he be allowed to handle the situation.  And, while it is true that racially harassing conduct be a co-worker need not be reported in order to be actionable, *Jackson v. Quanex Corp.,* 191 F.3d 647, 663 (6th Cir. 1999), Plaintiff's deposition testimony indicated that all of Bondy's comments were made outside of the presence of Defendant's authorities with the exception of the comment overheard by Clark, and Plaintiff has offered no other explanation for how Defendant was to learn of the offensive behavior beyond his reporting it.

Further, Plaintiff has not attempted to make a showing that the harassment affected a term, condition, or privilege of his employment.  The Court has merely been provided with a list of comments and jokes, many albeit in very poor taste and some decidedly racist, that have been made to or in the presence of Plaintiff during his tenure with Defendant, many without date reference.  Yet a hostile environment is present only when the workplace is "*permeated* with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" – "'mere utterance of an . . . epithet which engenders offensive feelings in a employee,' does not sufficiently affect the

conditions of employment to implicate Title VII." *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 21 (1993). The non-time-barred comments do not meet the required frequency or severity necessary to support a claim of a racially hostile work environment against an employer. It goes without saying that the Court is not condoning the making of such ignorant comments by offending individuals, but the request to attribute these to the employer cannot be granted without a proper showing.

Plaintiff further fails to make a showing that he was reasonable in failing to take advantage of corrective opportunities provided by Defendant with regard to the alleged harassment by Phillips or that Defendant knew or should have known about the alleged harassment by Bondy other than the one comment noted above. In sum, Plaintiff's hostile work environment claims should be dismissed pursuant to Fed. R. Civ. P. 56.

### B. <u>Title VII and Elliot-Larsen Claims Regarding Regional Manager Position</u>

In the context of his failure-to-promote claim Plaintiff seeks to use indirect evidence to support his claim and therefore must demonstrate: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time Plaintiff's request for the promotion was denied. *White v. Columbus Metropolitan Housing Authority*, 429 F.3d 232, 240 (6th Cir. 2005).

The parties appear to agree that Plaintiff is able to satisfy his *prima facie* case. Under the *McDonnell Douglas* framework the burden shifts to Defendant to proffer a legitimate, non-discriminatory reason for plaintiff's rejection. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).

Defendant provides the following as its legitimate nondiscriminatory reason for selecting

25

Freed over Plaintiff for the Regional manager position: Freed had management experience, fared better than Plaintiff in the interview for the position, had significant sales experience and product knowledge (albeit not from direct sales) and presented specific ideas for "turning around the region".

She also answered their initial concerns that she had no direct experience selling Defendant's proprietary pharmaceuticals by explaining that she had taken the training on the products more than once and had organized and taught trainings on the new products to new sales representatives.  It is undisputed that Plaintiff had knowledge of and sales experience with Defendant's proprietary pharmaceuticals.  Plaintiff also had a Masters' Degree in management.  Yet, Defendant explains that Plaintiff did not fare well in the interview and the decisionmakers all rated him fifth of the five candidates.

Upon Defendant's presentation of a legitimate non-discriminatory reason for its decision, the burden then shifts back to Plaintiff to demonstrate that the offered legitimate reasons are pretextual.  *Id.* at 804.  A Plaintiff establishes pretext by showing that the reason offered by the defendant: (1) has no basis in fact; (2) did not actually motivate the decision not to promote, or (3) was insufficient to warrant the decision not to promote.  *Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 258 (2002) (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994)); *Dubey v. Stroh Brewery Co.*, 185 Mich. App. 561, 565-566, 462 N.W.2d 758 (1990).

A plaintiff's burden of proving pretext differs under the federal statutes and Elliot Larsen.  The Michigan Courts require that plaintiffs satisfy the "pretext-plus" standard, meaning that "plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for . . . discrimination.  Therefore, "we find that, in the context of summary disposition, a plaintiff must prove discrimination with admissible evidence, either direct or circumstantial,

sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff. *Lytle,* 579 N.W.2d at 916 (footnotes omitted); *see also Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 568 N.W.2d 64, 68-69 (1997)." *Millner v. DTE Energy Co.*, 285 F.Supp.2d 950, 970 (E.D. Mich. 2003).

For the purposes of the federal statutes, pretext can be established by "(1) a direct evidentiary showing that a discriminatory reason more likely motivated the employer *or* by (2) an indirect evidentiary showing that the employer's explanation is not credible. *Carney v. Cleveland Heights-University Heights Sch. Dist.,* 143 Ohio App.3d 415, 428, 758 N.E.2d 234, 245 (2001). However, '[m]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.' *Carney,* 758 N.E.2d at 245. To avoid summary judgment, the plaintiff is required to produce evidence that the employer's proffered reasons were factually untrue. *Id.* (citing, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).)." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002) (emphasis supplied).

In support of his argument that Defendant's offered reasons for hiring Freed are pretext Plaintiff argues that (a.) the interviewers did not review the candidates performance reviews, which Plaintiff alleges was part of their normal hiring procedure; (b.) it is incredulous that he did not fare well in the interview because he makes his living as a sales person; and (c.) his qualifications were better suited for the position than Freed's.

Plaintiff quotes Interviewer Kunz as having said that it was standard protocol for interviewers to review candidates performance reviews (Dkt. #10, p. 29). Yet, Kunz corrected himself within several questions to say that reviewing performance reviews was not actually a standard protocol and

27

that he had not done so in this case because he was part of the final interview team and assumed it had been done at an earlier stage (Dkt. #10, Exhibit 13, Kunz Dep., p. 84).  Because this is the only evidence on which Plaintiff relies in support of his contention that a review of performance evaluations should have been done by Interviewers Gold, Kunz and Martin, Plaintiff cannot rely on their failure to review performance reviews to show pretext.  In any event, an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext.  *See Fischbach v. D.C. Dep't of Corr.,* 86 F.3d 1180, 1183 (D.C. Cir.1996); *Randle v. City of Aurora,* 69 F.3d 441, 454 (10th Cir. 1995).  Further, there is no allegation that some of the candidates were treated more favorably in this regard – no documents were reviewed by the interviewers for any candidate.  And, as Defendant points out, a review of the documents would have not have put Freed in a worse position to obtain the position, as her performance reviews were the same or better than Plaintiff's.  There simply is no direct or circumstantial evidence to support this argument for pretext.

Plaintiff's bald allegation that he could not have fared as poorly in the interview as the interviewers have testified he did will not suffice to defeat Defendant's Rule 56 evidence to the contrary.  Nor is it sufficient that Plaintiff feels his qualifications were superior to Freed's.  *Vredevelt v. GEO Group, Inc.,* 145 Fed. Appx. 122, 131, 2005 WL 1869607, *8 (6th Cir. 2005) (plaintiff's allegation that she was more qualified for the position than other candidate  is unpersuasive.  "At best, the comparison in this case is between two qualified employees."); *Johnson v. United States Dep't of Health and Human Servs.,* 30 F.3d 45, 47-48 (6th Cir.1994); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 584 (1992) (holding that the plaintiff's subjective skepticism regarding the truth of an employer's representation does not raise a triable issue as to pretext).

Plaintiff argues that because Freed did not actually sell Defendant's proprietary

28

pharmaceuticals she *had* to have inferior knowledge than he who had been selling them for years. Yet this does not address Defendant's argument that the interviewers were satisfied with Freed's product knowledge, which Freed had obtained through other means, i.e. by taking product classes and designing and implementing the training classes.

The alleged deposition testimony of Freed wherein she admits to feeling nervous when disciplining one of her direct reports is not alleged to have been available and/or considered by the interviewers. Furthermore, though Plaintiff is undisputedly a highly regarded salesperson, he did not proffer any evidence that he had management experience. Therefore, while Plaintiff argued that Defendant could not have honestly relied on Freed's management experience because she had only two direct reports, implying that this is too few, it appears that Plaintiff had even less management experience.[15]

The choice between Freed and Plaintiff boils down to a business judgment. The soundness of an employer's business judgment may not be questioned as a means of showing pretext for the purposes of surviving summary judgment on Plaintiff's Elliot Larsen claim. *Dubey, supra*, 185 Mich App. at 566. For the purposes of Title VII, while absolute deference to ones business judgment is not required, the reasonableness of an employer's decision may only be considered "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation. *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998)." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 -577 (6th Cir. 2003).

---

[15] Plaintiff did provide the affidavit of a co-worker, Greg Hall, whom he mentored, as proof that he had the capability to be a good manager (Dkt. #10, Exhibit 46, Hall Affidavit). Yet the opinions expressed by co-workers who had no direct involvement in the decision making process at issue are not probative of a defendant's discriminatory intent. *Haley v General Elec. Co.*, 3 Fed. Appx 240, 248 (6th Cir. 2001).

Here, Plaintiff has not provided sufficient direct or circumstantial evidence to support his argument that the Defendant's non-discriminatory reasons for choosing Freed over Plaintiff for the position of Regional Manager contain such errors of judgment that would allow a reasonable jury to opine that the reasons were pretextual. Therefore, his Title VII and Elliot-Larsen race discrimination claim regarding Defendant's failure to promote him to Regional Manager should be dismissed.

**C.   Title VII and Elliot-Larsen Claims Regarding 2004 Performance Review**

In his Response Plaintiff argued that the evidence surrounding his 2004 performance review supports a case of unlawful discrimination under Elliott-Larsen and Title VII pursuant to a mixed motive theory.

The Supreme Court first recognized the mixed-motive theory in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989) (plurality opinion), where the Court held that a plaintiff could shift the burden of proof to the employer to prove an affirmative defense upon a showing that the protected characteristic "played a motivating part in an employment decision." *Id.* The employer would then be held liable unless it "prov[ed] by a preponderance of the evidence that it would have made the same decision even if it had not taken plaintiff's [protected trait] into account." *Id.* An employer may still avoid liability in this manner in an Elliot-Larsen cause of action. *Harrison v. Olde Financial Corp.*, 572 N.W.2d 679, 684 (Mich. App. 1997). Yet, proof that an employer would have reached the same result without any discriminatory animus in a Title VII case only limits the remedies available to a plaintiff, but does not serve as a complete shield from liability. 42 U.S.C. §2000e-5(g)(2)(B); *Marbly v. Rubin*, 188 F.3d 508, 1999 WL 645662, *2, fn 2 (6th Cir. 1999); *Costa v. Desert Palace*, 299 F.3d 838, 850-51 (9th Cir. 2002)(explaining that the 1991 Amendments to Title VII were intended to overrule the Supreme Court's holding in *Price Waterhouse*) *aff'd, Desert*

*Palace, Inc. v. Costa*, 539 U.S. 90 (2003).[16]

The 1991 Title VII statutory provisions also codified the mixed-motive "alternative for proving that an 'unlawful employment practice' has occurred." *Desert Palace*, 539 U.S. at 94 (quoting 42 U.S.C. § 2000e-2(m)). The provision states that a plaintiff can raise a mixed-motive Title VII claim by "demonstrat[ing] that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). If the plaintiff makes such a showing, he is entitled to relief.

In 2003, the Supreme Court unanimously interpreted the 1991 Civil Rights Act to allow plaintiffs to bring mixed-motive discrimination claims based solely on circumstantial evidence. *Desert Palace*, 539 U.S. at 101-02. Yet, Michigan state courts continue to require direct evidence in order to bring a mixed-motive Elliot-Larsen claim. *Millner v. DTE Energy Co.,* 285 F.Supp.2d 950, 967 (E.D. Mich. 2003) (citing *Sniecinski v. Blue Cross and Blue Shield of Michigan*, 666 N.W.2d 186 (decided July 22, 2003, i.e., more than a month after the U.S. Supreme Court's *Desert Palace* decision) and *Topping v. Ferris State University*, 2003 WL 21508488, *6 (Mich. App., July 1, 2003) (unpublished decision)).

Prior to *Desert Palace*, the Sixth Circuit did not require a plaintiff to present a *prima facie* case or follow the *McDonnell Douglas* burden-shifting framework to get to the jury on a mixed-motive claim. *See, e.g., Cesaro v. Lakeville Cmty. Sch. Dist.*, 953 F.2d 252, 254 (6th Cir.1992). Rather, the employee only needed to show that the illegitimate reason "was a motivating

---

[16] The 1991 Act also provides that the employer's liability will be limited to injunctive and declaratory relief and attorney fees and costs if the employer can establish that it "would have taken the same action in the absence of the impermissible motivating factor." *Id*.; §2000e-5(g)(2)(B). The declaratory and injunctive relief may not include "an order requiring any admission, reinstatement, hiring, promotion, or payment." *Id.;* §2000e-5(g)(2)(B)(ii).

factor in an employment decision," and then "the employer [could] avoid liability only by proving

by a preponderance of the evidence that it would have made the same decision even if it had not

considered the plaintiff's [race]."  *Id.*

> However, now that such mixed-motive claims can be brought based on circumstantial
> evidence, the question arises as to the effect of *Desert Palace* on the analysis of
> mixed-motive claims at the summary judgment stage.  What is clear from *Desert
> Palace*, regardless of its impact on the *McDonnell Douglas* framework, is that to
> succeed on a mixed-motive claim, the plaintiff must adduce evidence that the
> protected characteristic "was a motivating factor" in the employer's adverse
> employment decision. 42 U.S.C. § 2000e-2(m) (emphasis added). "The ultimate
> question in every employment discrimination case involving a claim of disparate
> treatment is whether the plaintiff was a victim of intentional discrimination." *Reeves*,
> 530 U.S. at 153, 120 S.Ct. 2097. Applying *Desert Palace* and the 1991 Act to this
> standard, the ultimate question at summary judgment on a mixed-motive case is
> "whether the plaintiff has presented evidence, direct or circumstantial, from which a
> reasonable jury could logically infer that [a protected characteristic] was a motivating
> factor in [the defendant's adverse employment action against the plaintiff]." *Harris
> v. Giant Eagle, Inc.*, 133 Fed. Appx. 288, 297 (6th Cir.2005) (unpublished opinion)
> (alteration in original) (internal quotation marks omitted); accord 42 U.S.C. §
> 2000e-2(m); *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1068 (9th Cir.2003).

*Wright v. Murray Guard, Inc.*, 455 F.3d 702, 712-713 (6th Cir. 2006).

Plaintiff has submitted direct evidence which, if taken as true and in a light most favorable

to Plaintiff, establish Phillips' predisposition to discriminate, i.e. Phillips' alleged comments:[17]

(1.) to Jacinta Toland in October 1999 "no one wants to work with a black man" (Dkt. #10, Exhibit

20, Toland Dep.); (2.) to Plaintiff on January 14, 2004, "nobody wants to be around a black man"

(Dkt. #10, White Dep., Exhibit 2, p. 45); (3.) in answering a telephone call from Plaintiff and

referring to Plaintiff, Todd White, as "White, Todd" (*Id.* at 48) and (4.) in Plaintiff's presence in early

2005 referring to a co-worker as "oh that black girl" (Dkt. #10, White Dep., p. 39-41).

---

[17] Plaintiff also testified that he felt that Phillips' circulation of the email of Osama Bin
Laden morphing into O.J. Simpson in January 2005 was racially motivated (*Id.* at 114-22), but
did not submit this as direct evidence in his Response.

Direct evidence of discrimination, however, "must establish not only that the plaintiff's employer was predisposed to discriminate . . . , but also that the employer acted on that predisposition." *DiCarlo v. Potter,* 358 F.3d 408, 415 (6th Cir. 2004) (quotation omitted).

In support of his argument that Phillips acted on his alleged animus Plaintiff points to the following facts:

- Phillips forwarded him an October 22, 2004, email from Gold which had been sent to all Regional Managers in regards to a number of sales representatives, including Plaintiff, that were not meeting their Suprane sales goals and indicated that if the reps' Suprane numbers were not up to 95% by the end of the year they would receive a "does not meet" for their PMO, no salary increase and be placed on a performance improvement plan (PIP) (Dkt. #10, Exhibit 26);
- Phillips discouraged him from becoming a sales trainer;
- Plaintiff was not allowed to take an interviewing skills class;
- Plaintiff fared better on previous years' performance reviews, under a different supervisors than he had under Phillips; and
- his 2004 performance review was not "consistent" with Defendant's guidelines.

Yet, it is undisputed that:

- Plaintiff was not meeting his Suprane sales goals at the time Gold sent the email to Phillips, the receipt of the email was not an adverse employment action and Phillips was not the decisionmaker with regard to the email;
- Plaintiff did not apply for the Sales Trainer position, though Phillips admittedly discouraged him from applying;
- Phillips was not the decisionmaker with regard to the interview skills class, Phillips inquired into whether Plaintiff could take an interview skills class and was told that an interview skills class would not be offered for anyone due to budget constraints;
- Plaintiff had not met his 2004 Suprane sales goal by the end of the year and had met his sales goals in the previous years when he had received more favorable performance reviews; and
- though the 2004 Grid PMO Evaluations For TCS indicate that one can receive a PMO of "meets" for achieving 100% in "2 of 4 categories" as long as one is Suprane or Brevibloc, which Plaintiff met for selling Brevibloc at 107% and TDS at 101%, the fact remains that Gold had indicated to all the Regional Managers in October 2004 that no one that had a Suprane sales number of 95% or less could achieve a rating of anything more than "does not meet" and Plaintiff's Suprane was 92.8%.

The only action in which Phillips was the decisionmaker was the 2004 performance review and Plaintiff does not allege that Phillips' comments depicting racial animus were made in the context of that decision. Instead he appears to ask that the Court infer that if Phillips made the reprehensible comments then any decision he made that negatively affected Plaintiff must have been motivated by his racial animus. Yet, the law is clear, "[d]irect evidence is evidence that proves the existence of a fact without requiring any inferences." *Minadeo*, 398 F.3d at 763 (quoting *Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 548 (6th Cir.2004)).

Therefore, Plaintiff has failed to provide direct evidence that race was a motivating factor in his 2004 performance review. This is fatal to Plaintiff's Elliot-Larsen mixed-motive discrimination claim. *Millner, supra,* 285 F.Supp.2d at 967.

Although Plaintiff did not raise this issue in his brief, pursuant to the holding in *Desert Palace*, he could still argue a Title VII mixed motive case using circumstantial evidence, i.e. using the *McDonald Douglas* framework. This would entail showing (1.) he is within a protected class; (2.) he was meeting the legitimate expectations of his employer; (3.) he suffered an adverse employment action; and (4.) similarly situated employees not in the protected class were treated more favorably. *Sample v. Aldi, Inc.*, 61 F.3d 544, 548 (7th Cir.1995).

Yet, Plaintiff's claim fails under a mixed-motive theory as well, for two reasons. First, while "[a] determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a prima facie case, may be based solely upon the employee's testimony concerning the quality of his work," *Williams v. Williams Elec., Inc.*, 856 F.2d 920, 923, n. 6 (7th Cir.1988), in the present case the fact that Plaintiff failed to meet his employer's Suprane sales goal is undisputed. Second, the evidence submitted to the Court does not indicate the

existence of any similarly situated non-African-Americans who were treated differently with regard to the 2004 performance review.[18]  Therefore, even when circumstantial evidence and permissible inferences are considered, his mixed motive Title VII claim fails as well.  In sum, there remains no genuine issue of material fact regarding Plaintiff's claim of race discrimination regarding his 2004 performance review.

### D.    Unaddressed Disparate Treatment Claims

It appears from the lack of attention to the remaining issues in Plaintiff's Response that Plaintiff has either abandoned the disparate treatment claims regarding the award of stock options in 2002 and the Trade Relations Manager position or perhaps never intended the facts surrounding these incidents to serve as separate disparate treatment counts.

---

[18] Plaintiff points to the fact that Morris and Thomas, two white employees supervised by Phillips that "were at 100% in 2 of 4 products (one being Suprane or Brevibloc)", as was Plaintiff, were given "meets" for PMO No. 1 (sales) while Plaintiff was given a "does not meet". Yet, it is undisputed that (a.) all Regional Managers had been informed in 2004 that Sales Representatives achieving less than 95% of sales goals for Suprane were to receive a "does not meet" rating (Dkt. #10, Exhibit 26), (b.) Morris and Thomas met their Suprane sales goals at 103% and 107% respectively (see Table One above) and (c.) Morris and Thomas were therefore, not similarly situated to Plaintiff, who did not meet this goal, achieving Suprane sales of 92.8% at mid-year and 92% at year's end in 2004.  Likewise, Plaintiff provides data for numerous persons not supervised by Phillips who, for this reason, are also not similarly situated to Plaintiff.
    *See Mitchell v. Toledo Hosp*. 964 F.2d 577, 583 (6th Cir. 1992)("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects.  Stotts v. Memphis Fire Department,* 858 F.2d 289 (6th Cir.1988).  Thus, to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  *Mazzella v. RCA Global Communications, Inc.,* 642 F.Supp. 1531 (S.D.N.Y.1986), *aff'd,* 814 F.2d 653 (2d Cir.1987); *Linear v. Safeway Grocery,* 843 F.2d 298 (8th Cir.1988) (plaintiff must prove that he and the white employee were similarly situated in all respects and that the other employee's acts were of comparable seriousness to his own); *Cox v. Electronic Data Systems Corp.,* 751 F.Supp. 680 (E.D.Mich.1990).").

At any rate, they are briefly addressed in case the undersigned has misinterpreted Plaintiff's silence on these issues.

### 1.   2002 Stock Options

Defendant apparently concedes that Plaintiff has established a *prima facie* case of disparate treatment regarding the award of stock options in 2002 to several white sales representatives. Under the *McDonald Douglas* framework the burden shifts to Defendant to show a legitimate nondiscriminatory reason for this decision. Defendant argues that the 12 of 170 employees that were provided stock had "high potential", as does Plaintiff, but were seen as a "retention risk", which Plaintiff was not (Exhibit H, Taylor Dep., p. 6, 8). Given the availability of a legitimate nondiscriminatory reason, the burden then shifts to Plaintiff to show that this reason is merely pretextual. The record before the Court does not contain any evidence to support an argument against Defendant's proffer, which is fatal to a claim for disparate treatment based on the 2002 stock options award.

### 2.   Trade Relations Manager

Defendant argues that Plaintiff has failed to state a prima facie claim for disparate treatment with regard to the Trade Relations Manager and Sales Trainer positions because Plaintiff failed to apply for the positions. Defendant alleges that the Trade Relations position was posted on the company's intranet, that other employees applied and three were interviewed (Exhibit E, Martin Dep., pp. 85-98). The Sales Trainer Position was brought to his attention through an email from Scott Vickers (Dkt. #10, Exhibit 28). Plaintiff testified that he did not apply for either position (Exhibit A, White Dep., pp 224-26, 251-57, 281).

Because one of the *prima facie* elements of a claim for disparate treatment based a failure to

promote is that the plaintiff applied for and was denied the position in question, Plaintiff's claim for disparate treatment based on the Trade Relations Manager and Sales Trainer positions should be dismissed.

## IV. RECOMMENDATION

For the reasons stated above, it is Recommended that Defendant's Motion for Summary Judgment be GRANTED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days of sevice, as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections, which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: February 8, 2007                              s/Steven D. Pepe
Ann Arbor, Michigan                              United States Magistrate Judge

<u>Certificate of Service</u>

     I hereby certify that on <u>February 8, 2007</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Chrisdon F. Rossi, Michal L. Weissman</u>, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: <u>not applicable</u>

<u>s/ James P. Peltier</u>
Courtroom Deputy Clerk
U.S. District Court
600 Church St.
Flint, MI 48502
810-341-7850
pete_peltier@mied.uscourts.gov